CITY BANK OF BALTIMORE, *et al. vs.* JAMES SMITH.—*December*, 1831.

S gave his note, payable 50 days after the drawing of a lottery should be completed, "in cash, or prize tickets in said lottery," and secured the same by a mortgage. The mortgagee, two years after the drawing, assigned the mortgage. The tickets in the lottery certified that the holder thereof would "be entitled to such prize as may be drawn to its number, if demanded within 12 months after the completion of the drawing, subject to a deduction of 15 per cent. payable 60 days after conclusion." Upon a bill filed some years after the assignment, to sell the mortgaged premises for payment of a balance due upon the note, IT WAS HELD, that prize tickets which had not been presented to the managers of the lottery for payment, within the 12 months, could not be set off against the complainant's claim.

The prize tickets stipulated to be received in payment of the note, were intended to be available tickets, upon which the holders would be entitled to demand and receive, the prizes drawn to their respective numbers. They were those on which the prizes had been demanded within 12 months from the completion of the drawing, or on which the holder was entitled to demand the prizes, 12 months not having elapsed from the time of the drawing.

Equity will relieve against penalties and forfeitures, where the matter lies in compensation, whether the condition on which they depend, be precedent or subsequent. But notwithstanding it will in many cases interpose to prevent the divesting an estate, it will not relieve against the non-performance of a condition precedent to the vesting of an estate, by giving an estate that never vested, and that by reason of the non-performance of a condition precedent, will not vest in law.

APPEAL from the Court of Chancery.

The present bill was filed by the appellants, *the President and Directors of the City Bank of Baltimore, James Sterrett* and others, against the appellee, on the 16th day of October, 1827: it stated that *James Sterrett,* with one *Eli Simkins,* and *John P. Usher,* parties complainants, carrying on business under the firm of *Simkins and Usher,* and *Govert Haskins,* contracted with the managers of the *Washington Monument Lottery, 3d class,* for the purchase of the scheme: that the appellees, *James Smith* and *W. H. Clendenin,* being indebted to the said *James Sterrett,* as the treasurer of the contractors, in the sum of $13.365, upon a promissory note, dated July 26th, 1817, given for tickets purchased by

*Smith*, in said lottery, and payable fifty days after the completion of the drawing thereof, conveyed to *Sterrett* by way of mortgage, to secure the payment of the note, a certain house and lot in the city of *Baltimore*, by deed, bearing date the 28th of July, in the year aforesaid, with a provision, that the same should be void, if *Smith* should pay to *Sterrett* the sum of money in the note expressed, according to the terms thereof, either in cash, or *prize* tickets in said lottery, as by a copy of the deed exhibited with the bill, will appear. The bill then states, that the drawing of the lottery was completed on the 12th of December, 1817, and that *Smith* made various payments, in cash, or prize tickets, on account of the note, and that on the 18th of April, 1820, there remained a balance due thereon, for principal and interest, of about $3000: that *Sterrett*, by deed dated on the 18th of April, 1820, assigned the mortgage for a valuable consideration, to the *City Bank of Baltimore ;* but that *Smith*, the mortgagor, refused to pay the same, or any part of the money due thereon, to the said *City Bank*. *Prayer*, that the mortgaged property be sold to pay the debt, and for general relief.

The *answer* of *Smith* admitted the execution of the note and mortgage, as stated in the bill, but denied that the debt therein mentioned was due to *Sterrett* in his own right, but as trustee for the persons who contracted for the purchase of the scheme of the lottery mentioned in the bill, and charged that defendant purchased of the tickets of said lottery, to the amount of the note referred to, and that the mortgage was given to secure the same, and for no other purpose : that he has made many payments, and is also entitled to considerable credits for lottery prizes, which have not yet been allowed him, and that when every thing to which he is entitled shall be credited, nothing will be due upon the aforesaid note : that *Eli Simkins*, one of the contractors, is largely indebted to defendant, and he is informed, and believes that the contractors made heavy profits by the purchase and sale of said lottery, and he insists that he has a right to set off the pro-

portion of the same, to which said *Simkins* may be entitled, against the amount due on his said note: that *Sterrett*, the treasurer of the contractors, has never settled with them for their proportion of the profits of the lottery, but that he has converted the same to his own use, and that the assignment by him to the Bank of this defendant's note and mortgage, was without their knowledge or approbation, and wholly unauthorised and void.

The note referred to in the bill and answer, is in these words: "*Baltimore*, 26th July, 1817. ($13.365.) Fifty days after the drawing of the *Washington Monument Lottery, third class*, is completed, we, the subscribers, jointly and severally, promise to pay to *James Sterrett*, or order, in cash or prize tickets in said lottery, the sum of thirteen thousand three hundred and sixty-five dollars, for value received."

The assignment by *Sterrett* to the Bank, dated April 18th, 1820, recites, among other things, "that, whereas there now remains due on said mortgage, the sum of $3000, or thereabouts, inclusive of interest; and whereas, in part satisfaction and discharge of a debt due from the said *Sterrett* to the said Bank, the said *Sterrett* hath proposed and agreed to execute these presents. Now this indenture "witnesseth, that for and in consideration of the above recited premises, and of the sum of five dollars, lawful money paid, the said *Sterrett*, &c."

A *commission* issued, under which depositions were taken and returned.

*John S. Gittings*, examined on the part of complainants, proved, that there were sundry endorsements on the note of *Smith* and *Clendenin*, all of which, down to the 6th of April, were in the hand writing of *Sterrett*, when a balance of $3254 80, was struck; that the subsequent endorsements down to the balance of $2847 60, are in deponent's hand writing, he having been a clerk in the *City Bank* for three years, and that the final balance of $2747 60 is in the hand writing of said *Sterrett*. Defendant frequently acknowleged

to deponent to owe the balance appearing due at different periods, and when called upon, promised payment.

*Govert Haskins*, on the part of the defendant, proved, that he was interested in the purchase of the lottery referred to in the bill and answer, and that from information received from *Sterrett*, he believes it resulted profitably, though he has not received his proportion, nor settled with *Sterrett* for the same, notwithstanding frequent applications to him for that purpose.    *Sterrett* was a joint contractor and treasurer for the purchasers; the witness also stated, that the note, which the mortgage from defendant to *Sterrett* was given to secure, was given for a number of tickets which defendant purchased from *Sterrett*, as the treasurer of the contractors, and that he, the defendant, never authorized *Sterrett* to assign said note and mortgage.

It was proved on the part of defendant, that *Sterrett, Simkins* and *Haskins*, purchased the scheme of the lottery from the managers, and that they paid the purchase money; that they gave bond to the managers for the payment of the prizes, which the witness (who was treasurer for the managers) supposes they paid, as the managers had been called on for none.

*John B. Morris*, on the part of complainants, proved, that in the latter part of the year 1820, the defendant called at the *City Bank of Baltimore*, and was there for some time in conversation with deponent; that defendant at that time observed he would give a note, provided the Bank would cancel the mortgage; and that in a subsequent conversation, defendant received the proposition to give a note, provided the mortgage was cancelled, which deponent said could be of no use, as the Bank after obtaining judgment on the note, could give indulgence; that it was not until the latter part of the year 1820, that the Bank were apprised that pretensions to an interest in said note, were set up by any one, and that the note had been assigned to the Bank twelve months prior to his conversation with defendant.    It was further proved by a witness who was present at the examination

of *John B. Morris*, that at that time, defendant remarked he had offered *Morris* an endorsed note, for the note which the Bank held secured by the mortgage; that *Morris* replied, that he might have done so, but it had escaped his recollection. It was proved that the drawing was completed on the 12th December, 1817. The following is a copy of one of the prize tickets, produced by *Smith* as a set off:

" *Washington Monument Lottery, third class.* The holder of this ticket will be entitled to such prize as may be drawn to its number, if demanded within twelve months after completion of the drawing, subject to a deduction of fifteen per cent. payable fifty days after conclusion. *Baltimore,* June, 1816. *F. Lucas, Jr.* Mr. No. 22,431."

In conformity with an order of the Chancellor, the auditor stated an account between the parties.

No. 1, stated agreeably to the complainants' instructions, showed a balance due them for principal and interest on the 12th June, 1818, of $2444 69. In this account the defendant is charged with the amount of his note, and credited for payments in cash and prize tickets, claimed within twelve months after the completion of the drawing, as limited on the face of them, and for a pair of oxen, &c.

No. 2. An account stated in conformity with the defendant's views, credits him for all the prizes, as well for those demanded since, as those demanded before the expiration of twelve months after the drawing of the lottery, and shows that he had over paid the principal of the note by $14 80, though a small balance of interest remained due. Many of the prizes credited in account No. 1, as having been demanded within the twelve months, were for small sums, whilst some of those which were rejected on that account, because not presented in time, but credited in account No. 2, are for $100, and some $500; they were exhibited to the auditor on the 30th of July and 20th October, 1825. To the allowance of these prizes the complainants excepted.

*Bland,* Chancellor, at September term, 1830, confirmed account No. 2, and decreed that defendant pay to the com-

City Bank, *et al.* *vs.* Smith.—1831.

plainants, or bring into court, to be paid them, the amount therein stated to be due; and that each of the parties pay their, or his respective costs.

From this decree the complainants appealed to the Court of Appeals.

The cause came on to be argued before BUCHANAN, Ch. J., ARCHER, and DORSEY, J.

*John 1. Donaldson*, for the appellant, contended,

1. The prize tickets, where the prizes were not demanded within the twelve months, could not be set off against the original parties to the contract: he insisted that it was the policy of the lottery system, to limit a time for the presentation of prize tickets, that the whole scheme might be brought to a close within an early period; and it was designed that the prizes should be forfeited, if not demanded within the prescribed time. *Barruso vs. Madan*, 2 *Johns.* 145. The presentation within the time, was a condition precedent to a title to the prize, against which equity will not relieve. 1 *Chitty's Eq. Dig.* 224. 2 *Eq. Cases Abrid.* 209. *Popham vs. Bampfield*, 2 *Vernon* 83. 2. But if they could be set off against the original parties, they cannot be against the assignees after the admission to the agents of the *City Bank* that the defendant owed the money.—*Chambers vs. Goldwin*, 9 *Ves.* 270. *Chapman vs. Hart*, 1 *Ves. Sr.* 272. *Kemp vs. McPherson*, 7 *Harr. and Johns.* 320.

*Johnson and Mayer*, for the appellee.

1. The attempt of the Bank to place themselves on higher ground than their assignor, *Sterrett*, cannot succeed in the present state of the pleadings. The bill does not aver that the Bank was ignorant of the nature of the transaction; on the contrary, it admits a knowledge of it, for it appears manifestly, that the Bank knew that *Sterrett* held the mortgage, as the treasurer and agent of the contractors. When a second incumbrancer, either as plaintiff or defendant, seeks to be relieved from a prior incumbrance, he must allege the

ground for such relief in his bill or answer, as the case may be. *Brinckerhoff vs. Lansing*, 4 *Johns. Ch. R.* 65, 71. The mortgagee, *Sterrett*, does not stand in a better condition than his contractors, and they certainly could not deprive *Smith* of this defence. But the mortgage upon its face, contains constructive notice of the nature of the transaction. The Bank being a purchaser of the note and mortgage, as a security for its payment, were bound to take notice of its character. *Sugden Vend.* 5 *London Ed.* 649 *to* 651. The mortgage refers to the note, as having been given to *Sterrett*, as the treasurer of the contractors. This, at any rate, was sufficient to put the parties on the inquiry, which amounts to constructive notice. It was not the duty of *Smith* to go to the Bank, but the Bank was bound, if in doubt as to the character of the transaction, to go to him to make the necessary inquiries, and they were guilty of *crassa negligentia* in not doing so. 2. Considering then, that the Bank stands in the shoes of *Sterrett*, the question is, whether *Smith* has not a right to avail himself of the prize tickets, by way of payment or set off? Both the note and mortgage show a contract to pay in cash or prize tickets, and there is nothing in either limiting a time within which the tickets shall be presented. The question is not, what are the rights of the holders of prize tickets, as against the managers of the lottery, though even as against them, the holders would be entitled to be paid as creditors of the lottery fund, if it had not been distributed; the question here is, between the holders of tickets, not presented within the time limited on their face, and the purchasers of the scheme, who have given bond to the managers, securing to them a certain sum of money to accomplish the object of the lottery, which sum has been paid. The object of the lottery then, has been effected, and there can be no reason founded in the supposed policy of the lottery system, why the purchasers of the scheme should not be bound to pay the prizes; if even the avails of the lottery had been divided among the contractors, a question might be raised, as to the rights of the defendant

to be allowed for the tickets in question, but the evidence shows that this has not been done, but that the whole amount is still in the hands of *Sterrett,* the treasurer. *Smith* is not a volunteer, but a purchaser for value, and the moment a ticket held by him came up a prize, in that prize he had a vested interest. The parties responsible for the prizes, are the very persons to whom *Smith* paid the money for the tickets, and equity, therefore, requires that they should pay. The right to the prizes was a vested and valuable right, subject to be defeated, by lapse of time, at law; it was liable to attachment, bequest, or transfer—it was not suspended for twelve months, but demandable at any time within twelve months. The rule *now* is, that a court of equity will relieve against a condition unperformed, if the case be such, that compensation can be made, or the parties placed in the same situation, as if the condition had been performed. *Moss vs. Matthews,* 3 *Ves. Jr.* 279. *Vernon vs. Stephens,* 2 *P. Wm.* 66. *Oddy vs. Torlas,* 2 *Vernon,* 362. *Cattell vs. Money,* 3 *Bro. Ch. C.* 256. *Taylor vs. Popham,* 1 *Ib.* 168. 1 *Bac. Abrid.* 642. 1 *Madd. Ch. P.* 41, 42. On the 18th December, 1818, when the twelve months from the completion of the drawing had expired, the money to pay the prizes remained in the hands of *Sterrett,* the treasurer, and it was therefore the same to him, whether the tickets were presented before or afterwards. Justice requires that the prizes should be paid, and when *Sterrett,* or those claiming through him, ask a court of equity to give them the benefit of the mortgage, they will be compelled to do equity by paying the prizes. The delay in presenting the tickets has not changed *Sterrett's* situation for the worse. 3. It does not appear that the Bank advanced money to *Sterrett,* as a consideration for the assignment of the mortgage; it was taken to secure a pre-existing debt due from him, and there is no evidence that the assignees have lost any advantage by the alleged conduct, and promises of *Smith* to pay the money; this distinguishes it from the case of *Kemp vs. McPherson,* 7 *Harr. and Johns.* 337.

*Taney,* (Att'y Gen'l U. S.) in reply,

1. The set-off relied on by the defendant, could not be used against the managers of the lottery ; it consists of prize tickets issued by those managers, and the contract of the holders was with them. The tickets upon the face are payable sixty days after the drawing, and are required to be presented within twelve months from its completion. The contractors purchased all the tickets from the managers for a valuable consideration. The defendant's note given for tickets, became due fifty days after the drawing, and consequently ten days before the prizes : the tickets now attempted to be set-off, were not presented until July, 1825, more than seven years after the time limited for their payment. There is no evidence to show when they came to the possession of the defendant, from whom he obtained them, nor is any excuse offered for the delay; the presumption, therefore, is, that he obtained them about the time he exhibited them. This fact is assumed, and then the question is, what equities arise to the defendant, upon supposed rights then acquired? if he asks for an equity derived from a prior possession, it is his duty to prove such possession. The first question, then, is, could these tickets be recovered of the managers? The contract by its terms was conditional. The tickets, the evidence of that contract, were valuable, upon two contingencies ; 1st, that they should draw prizes; and 2d, that they should be presented within twelve months. The time of payment and the demand are in separate clauses of the contract; both contingencies are conditions precedent. The demand within the prescribed period, was inserted for the safety of the managers, and benefit of the scheme, because, if no demand was necessary, innumerable suits might be brought, swallowing up the whole profits of the lottery : the *demand* then, was not a mere formal condition, but of the essence of the contract. If a demand within the twelve months is not material, then the money for the prizes may be demanded, and recovered of the managers now ; as the right to sue arises upon demand, limitations would be no bar.

Equity cannot relieve against an unperformed condition precedent. 1 *Chitty's Dig.* 224.   2 *Eq. Cas. Abrid.* 229. The case referred to, on the other side, from 1 *Bac. Abr't.* 642, and 2 *Vernon,* 362, were conditions subsequent; and 1 *Madd. Ch. P.* 41, 42, shows that equity can only relieve in the case of a condition subsequent, when compensation can be made.   Even in cases of forfeiture, if the forfeiture is complete, and the estate vested, equity cannot relieve.   1 *Chitt. Dig.* 453.   If by reason of non-performance the estate has not vested, equity cannot vest; or if by reason of the non-performance of a conditional limitation, the estate has vested in another party, equity will not divest it out of the latter, and vest it in the former. 2. But suppose equity could relieve, in this case of an unperformed condition precedent, this is not a case fit for equitable interposition; the party at all events should be required to come in a reasonable time.   A delay of some years is too long; public policy and convenience require that an earlier application should be made.   3. The situation of the contractors is not worse than that of the managers; their rights depend upon the stipulation in the note, and there is nothing in it to show that it was to be paid in other prize tickets than those for which the managers would be responsible.   The circumstance of its becoming due ten days before the prizes were payable, shows that it was to create a fund for their payment.   Such tickets only, were to be received in payment, as would be equivalent to *cash* in their settlement with the managers.   It cannot be presumed that the contractors meant to assume a larger responsibility than the managers, in reference to the prizes; they were merely bound to indemnify those managers, by paying those prizes, and those only, for which they were answerable: but for the terms of the note, prize tickets could not be set-off at all, because the tickets were issued by, and from a contract with the managers, and not the contractors.   4. It is not material whether the Bank had or had not notice, that *Sterrett* was a trustee for the contractors, because they join

in the bill, and pray that the money may be paid the Bank. The material question upon this part of the case is, had the Bank notice that *Smith* held, and claimed to set-off the tickets, for which he now asks to be credited? If the assignees had no such notice at the time of the assignment, and *Smith* induced them to believe that the amount stated to be due would be paid, he is not entitled to the set-off. The evidence shows clearly that he did so, and offered to give his note for the amount.

BUCHANAN, Ch. J., delivered the opinion of the court.

The note given by the defendant to *James Sterrett*, to secure the payment of which, the mortgage to *Sterrett* was executed, was for the price of a number of tickets in the *Washington Monument Lottery, third class*, (the scheme of which had been purchased from the managers by *Sterrett* and others,) and payable by its tenor, in cash or prize tickets in that lottery, fifty days after the drawing should be completed. The drawing of the lottery was completed on the 12th of December, 1817, and the bill being for the fore-closure of the mortgage, (which, on the 18th of April, 1820, was transferred to the complainants, the *President, Directors, and Company of the City Bank of Baltimore*, in consideration of a debt due from him to them, and a further pecuniary consideration,) and a sale of the mortgaged premises, to satisfy the balance claimed to be due on the note, various payments having been before made by the defendant in cash or prize tickets, the question is, whether the defendant is at this time, entitled to a credit for a number of prize tickets, which were not demanded within twelve months after the completion of the drawing of the lottery?

It can scarcely be doubted, that the prize tickets stipulated to be received in payment of the note, were intended to be available tickets; not such as had lost their validity, but tickets, on which the holder would be entitled to demand and receive the prizes drawn to their respective numbers. None other would be a prize ticket within the

meaning of the contract; and as it relates to prize tickets in the 3d class of the *Washington Monument Lottery,* it is proper to inquire what was a prize ticket in that lottery, on which the holder was entitled to receive the prize drawn to its number. That inquiry is gratified by an inspection of the tickets themselves, by each of which, the holder is advised, in the language of the ticket, that he "will be entitled to such prize as may be drawn to its number, if demanded within twelve months after the completion of the drawing." It was not a concealed or hidden purpose, or of doubtful import, but a palpable notice to all the world, by which every purchaser was informed of the terms, on which alone, he could become a successful adventurer. It informed him, that a prize being drawn to the number of his ticket, was not alone sufficient; but that, to entitle himself to such prize, it was necessary he should demand it within twelve months after the completion of the drawing. A prize ticket, therefore, in the third class of the *Washington Monument Lottery,* the holder of which was entitled to the prize drawn to its number, was one, on which the prize had been demanded within twelve months from the completion of the drawing: or one, the holder of which was entitled to demand the prize, twelve months not having elapsed from the time of the drawing. It was a part of the scheme of the lottery, that the prizes not demanded within twelve months should become a part of the fund, which it was the object of the lottery to raise; and the probability that a portion of them would not be demanded, entered into the calculation of the chances. To which scheme, and to the condition plainly expressed upon the face of such ticket, every purchaser gave his assent, by the act of becoming a purchaser.

The time and circumstances attending the claim to a credit for these tickets, are not such as to invite the favorable consideration of the court. The note was given on the 26th of July, 1817, and the mortgage we have seen, was transferred to the *President, Directors, and Company of the City Bank of Baltimore,* on the 18th of April, 1820,

more than two years afterwards. Between the date of the note and the assignment of the mortgage, various payments were made on the note by the defendant, in cash or prize tickets, leaving a large balance, which, it is proved by *John S. Gittings,* then acting as the agent of *Sterrett,* he frequently admitted to him was due, and promised to pay. Here the inquiry forces itself upon us, why, if he then owned, or was in possession of the prize tickets, for which he now claims a credit, and thought himself to be entitled to do so, did he not apply them to the payment of the note, or claim a credit for them, when he was making payment in other prize tickets? They amounted to a large sum, (several thousand dollars,) too large a sum it would seem to have been overlooked or forgotten. And why, with such ready means of payment, did he acknowledge to the agent of *Sterrett,* that he owed the balance appearing upon the note to be due, and frequently promise to pay it? In the latter end of the year 1820, after the assignment of the mortgage, and when he had a knowledge of that assignment, he at different times, in conversations with *John B. Morris,* who was acting for the Bank, proposed to give a note for the balance due on the note in question, if the Bank would cancel the mortgage. And it is proved by another witness that he heard him, several times, say to *John B. Morris,* that he had also offered an endorser. Why did he not then, when negotiating with *Morris,* for an adjustment of the balance claimed to be due upon the note, instead of offering a new note for that balance with an endorser, offer in payment the prize tickets for which he is now claiming a credit? If he then possessed or owned them, and was entitled to the credit claimed, it is difficult to conceive that he could have forgotten them, or why he did not claim to be allowed for them, when pressed for a settlement of the note; they were prizes, many of them of 20, others of 50, and some of $500 each. It was not that he was inattentive to his interest, because he did claim other credits; and if he had the tickets, and supposed he was entitled to it, he ought to have claimed

this. It was a matter peculiarly within his own knowledge, for the Bank cannot be presumed to have known that he had such tickets in his possession, and it was his duty to have disclosed it, if he intended ever to set them up against the claim upon the note and mortgage, or supposed he had a right to do so; and not by concealment to deceive the Bank, at the very moment when he was pressed for payment of the balance claimed upon the note. The original bill for a fore-closure of the mortgage, which was filed in May, 1820, was dismissed for the want of proper parties, on the 21st of December, 1826; but by an agreement appearing in the record, all the proceedings and evidence in that case are to be used in this. In his answer to that bill, the defendant sets up no pretence that the note was satisfied, or that he was entitled to any credit on account of any tickets in his possession. And although testimony was taken under the commission in relation to a few prize-tickets which were alleged to have been lost, amounting to something more than $78, and for which a credit had been claimed, and also in relation to a pair of oxen, both of which credits are allowed by the auditor in his statement; yet no testimony whatever, was taken, nor claim set up, in relation to those prize tickets, of so much more importance, until July, 1825, when, for the first time, they were exhibited before the auditor, and the amount of the prizes insisted on as a credit against the note, more than seven years after the drawing of the lottery, and more than five years after the filing of the bill. During the whole of this time, the defendant was pressed for payment of the balance claimed to be due on the note, and for the greater part of the time, proceedings in Chancery were going on to enforce the payment. From all which, the conclusion is irresistible, that the defendant was not in possession of, nor had any interest in the tickets in question, at any time, before the assignment of the mortgage to the Bank, nor until long after. And he comes into a Court of Chancery with a bad grace, insisting upon a credit for them now, to which, by his proposal to give a note with an endorser,

for the amount claimed to be due, if the Bank would cancel the mortgage, he virtually admitted he was not at that time entitled, and without showing how, or when, or from whom, he obtained the tickets for which the credit is claimed. By the stipulation in the note of the defendant, that it should be payable in cash or prize tickets, such tickets were meant as would, at the time of payment, entitle the holder to their prizes, which, according to the terms of the condition expressed upon the face of each of them, is not the character of the tickets, for which, the defendant now claims a credit against his note, none of them having been demanded within twelve months after the drawing of the lottery; and consequently not being such, as entitle the holder to the prizes drawn to their numbers. And adhering to the express terms of the lottery, if this was a proceeding by *James Sterrett* and the other purchasers of the scheme, to enforce the payment of the note, the defendant would not be entitled to the credit he claims; the omission by the holders of tickets to demand the prizes in time to entitle themselves to them, being one of the sources of profit, which the purchasers of the scheme had a right, and probably did look to and rely upon, as a part of the scheme of the lottery. In that respect, occupying the position of the original managers, for they purchased the scheme with all its advantages. It was only by the terms of the note, that prize tickets were made receivable at all in payment; for without that stipulation, the defendant would have had no right to pay off his note in prize tickets, and to settle his claim for prizes in that way, but must have looked to the original managers for payment of his prizes; and to compel the receipt now, of such as are not available, and do not entitle the holder to demand and receive the prizes from the managers, would not be to oblige the parties to fulfil their engagement, but to coerce them to do what they never contracted to do, what, by the terms and spirit of their engagement, they were under no obligation to do; for their engagement was not to receive in payment, tickets that would not entitle the holder to the prizes

drawn to their respective numbers; and as to such tickets, it is, as if there was no stipulation to receive prize tickets in payment at all, and the note was payable in cash only. And if the defendant would not be entitled to a credit for those tickets, as against *Sterrett* and the other purchasers of the scheme, in proceedings by them to foreclose the mortgage, what pretence is there for such an allowance, as against the assignees of the mortgage, who took it more than two years after the drawing of the lottery had been completed; and when the balance claimed on the note was acknowledged by the defendant to be due, and no claim to a credit for those tickets had been set up, nor until five years afterwards, though the defendant was pressed for payment, to which he might have applied them at any time within twelve months after the drawing, if he was then in possession of them, of which there is no evidence, but every reason to believe that he did not obtain possession of them for many years after the title of the assignees had accrued. And though the note informed them that it was payable in prize tickets, yet they were also informed by the tickets themselves, that the defendant could not, according to the scheme of the lottery, be in possession of any tickets applicable to that purpose, when they received the assignment of the mortgage; the time having elapsed within which alone the holders of tickets were entitled to demand and receive the prizes drawn to their numbers. They took the assignment of the mortgage, therefore, not only, without notice of any subsisting claim to a credit for these tickets, but with the assurance, looking to the terms of the lottery as proclaimed on the face of each ticket, that there could be no such claim.

But it has been strongly urged, that the assignees of the mortgage took it subject to all the equity of the mortgagor as against the mortgagee; and that this being the case of a condition, equity will relieve against the effects of the non-performance of it, by giving to the defendant the benefit of the prizes, though not demanded according to the condition.

Equity will relieve against penalties and forfeitures, and where the matter lies in compensation, whether the condition be subsequent or precedent; as if it be for the payment of a certain sum of money at a certain day, and the payment at a subsequent day will be a compensation for the non-performance, the intent being to secure the payment of the money. But notwithstanding it will, in many cases, interpose to prevent the divesting an estate, it will not relieve against the non-performance of a condition precedent to the vesting of an estate, by giving an estate that never vested; it will not vest an estate, that by reason of the non-performance of a condition precedent will not vest in law. This is not a case of forfeiture; no right to the prizes for which the credit is claimed, was ever acquired, to be forfeited. Nor is it one in which the matter lies in compensation; for if the defendant is to be relieved against the non-performance of the condition, by being allowed a credit for the amount of the prizes drawn to the numbers of those tickets— what is to be the compensation to the assignees of the mortgage, who would thus lose the amount of the prizes so credited? It is not within the principle on which equity will relieve, where a compensation can be made, as where the condition is for the payment of a certain sum of money at a certain day, the breach of which condition may be compensated by payment at a subsequent day. But here the entire loss would rest upon the assignees of the mortgage, without any compensation; and it would be the same, if the proceeding was by the purchasers of the scheme, who by the allowance of the credit here claimed, would be deprived of the benefit of the prizes, without any compensation, to which, by the omission to demand them within twelve months after the completion of the drawing of the lottery, they become entitled, as a part of the profits of the scheme, and of their purchase. Neither is it the case of a condition subsequent; but a demand within twelve months after the completion of the drawing, was a condition precedent to the vesting of the right to the prizes, and without the per-

formance of which, the right could not vest in law; and equity will not relieve by interposing to vest the right.

We therefore think, that the defendant is not entitled to the credit claimed; and that the decree ought to be reversed with costs; and a decree passed for a foreclosure, and sale of the mortgaged premises, to satisfy the amount due, with interest, according to account No. 1, as stated and reported by the auditor.

DECREE REVERSED.