CLAUDE ROTHERY ET AL., TRUSTEES,

*vs.*

FRANK J. LOWE.

*Contract for Loan—Non-Compliance with Condition—Theatre as Going Concern.*

In an action for breach of a contract to make a loan for the purchase of a moving picture theatre, it appearing that the contract was conditional on plaintiff's success in making the theatre a "going concern," *held* that a verdict should have been directed for defendants, the evidence showing that plaintiff, after operating the theatre about ten days, was compelled to close it until he made certain improvements demanded by the city, and that he refused to make the improvements, abandoned the purchase, requested a return of his application for the loan, and obtained from the owners a return of part of what he had paid on the price.

*Decided January 9th, 1924.*

Appeal from the Superior Court of Baltimore City (DAW-KINS, J.).

Action by Frank J. Lowe against Claude Rothery and others, trustees, doing business under the name and style of Union Home Builders. From a judgment for plaintiff, defendants appeal. Reversed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*W. Leslie Prout* and *George A. Solter,* for the appellants.

*Harry O. Levin,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought by the appellee, Frank J. Lowe, in the Superior Court of Baltimore City, against "Claude Rothery, Albert Wilcox, S. E. Beach, F. C. Weeks and William C. Woodward, trustees, doing business under the name and style of Union Home Builders."

The declaration alleged

"that the defendants * * * were engaged in the business of loaning on real estate in the City of Baltimore, and elsewhere, and that the plaintiff, contemplating the purchase of the 'Park' moving picture theatre, at 2265 N. Fulton Avenue, in said city, consulted with the defendants concerning a loan of $8,500, to be secured by a mortgage on said property, and that the said defendants, through their duly authorized agents, on or about the month of April, 1921, agreed to make said loan and advance the sum of $8,500 to the plaintiff, and payable $100 per month, with interest at six per cent., whereupon the plaintiff relying on said promise of the defendants, entered into an agreement to pay $9,000 for said property, and $500 as a deposit thereupon; and that relying on defendants' promise he expended a large sum of money for repairs and alterations to said property. That although the plaintiff performed all on his part to be performed, the defendants wholly failed and refused to make said loan and advance the sum of $8,500 as agreed, although due demand was made therefor by the plaintiff, whereby the plaintiff was damaged in that he was deprived of the deposit of $500 paid by him as well as certain monies expended in alterations and repairs to the property."

The only pleas filed were as follows: "And the said Union Home Builders, a corporation, the defendant in this action. * * * says: For a first plea that it never was indebted as alleged; and for a second plea says: that it did not promise as alleged," and the trial of the case, which resulted in a verdict for the plaintiff for $571.50, was on the issue joined

on those pleas.  On a motion for a new trial the court below
reduced the verdict, and the appeal is from a judgment in
favor of the plaintiff for $527.22.

The contract sued on was not in writing, but is based on a
verbal agreement or understanding between the plaintiff and
Lorenzo G. Gregg, district manager of the Union Home
Builders.  While the evidence produced by the plaintiff is
not very clear as to the terms of the contract, when viewed
in the light most favorable to the plaintiff it is to the effect
that some time prior to the 12th of July, 1921, the plaintiff
went to see Mr. Gregg at his office in Baltimore City for the
purpose of securing a loan from the Union Home Builders
of an amount sufficient to enable him to purchase the prop-
erty No. 2265 North Fulton Avenue, known as "The Park
Theatre," where he proposed to operate a moving picture
theatre; that the property had "been previously operated as
a moving picture place * * * and had been a valuable stand
at one time, but business had gone back in that section," and
the theatre was no longer "a going concern," but "had been
closed down for several months"; that the plaintiff told Mr.
Gregg that he could get the property for $9,000, and that
Mr. Gregg told him "to get a forfeit on the place," and that
he would lend him the money, or recommend the loan, on
the building with the theatre as a going concern; that Mr.
Gregg did say that it had to be a going concern, but did not
say it had to be a going concern for "a year or two years";
that the loan was to be for twelve years on a mortgage of
that property and thirty lots in Locust Grove, and to be re-
paid by the plaintiff at the rate of $100 per month; that on
the strength of Mr. Gregg's statement the plaintiff entered
into a written contract with George and Georgia Konstant,
the owners of the property, on the 12th of July, 1921, for
the purchase of the property for $9,000; that the plaintiff
paid, or made a deposit of $500 at the time the contract was
executed, and agreed to pay the balance within sixty days;
that in the negotiations for the purchase of the property, and

at the time of the making of the contract with the owners, the plaintiff was represented by his attorney, Mr. Prout, and the Konstants were represented by their attorney, Mr. Demarco; that Mr. Prout first tried to secure an option on the property, but that Mr. Demarco refused to give an option, saying that he wanted to sell, and offered to make a thirty days' contract, and finally agreed to make the time for the payment of the balance of the purchase money sixty days. The plaintiff testified that the contract of purchase, which was not offered in evidence because it had been destroyed, called for immediate possession of the property, and "was so worded that at the expiration of the sixty days from date. if for any reason I did not pay the balance of the purchase price there would be no suits against me for specific performance of the contract. And that if for any reason I did not want to take the property over I would be able to get out the transaction with an expenditure of $500 and not having any suits coming back on me for specifiec performance of the contract." The evidence produced by the plaintiff is also to the effect that Mr. Gregg was advised of the terms of the purchase and agreed to have the balance of the purchase money ready for the plaintiff by the 10th of September; that the plaintiff took possession of the property on the 13th of July, 1921, the day after the contract of purchase was executed, and after having some painting and papering done, which cost $20 and $35, putting in some electric fixtures on which he made four payments of $8.34 each, and having some other repairs made which cost $3.50, he opened the theatre about two weeks after he made the purchase; that shortly after he opened the theatre the plaintiff was arrested because the man he employed to operate it did not have an operator's license; that plaintiff employed another man who had an operator's license, but after conducting or operating the theatre in all about ten days, he was again compelled to close it because the theatre did not have a back outlet; that the city insisted upon his having a rear

exit in the theatre; that when his counsel, Mr. Prout, reported to Mr. Demarco, counsel for the Konstants, that the city would not permit the plaintiff to operate the theatre because there was no exit in the rear of the building, Mr. Demarco gave the plaintiff permission to cut and make an exit through the rear portion of the building and to go out over the Konstants' lot; that plaintiff's counsel also secured from Mr. Demarco an extension of the time for the payment of the balance of the purchase money of twenty days, and then advised the plaintiff to get an estimate of the cost of making the rear exit from the building, but that he refused to do it, and, instead of getting an estimate of the repairs or improvements mentioned, went to see Mr. Gregg and asked him to give him back his application for the loan; that between the 9th and 18th of September the plaintiff also got from his counsel, Mr. Prout, his copy of the contract with the Konstants, and then employed Mr. Chambers, another attorney, to get back a part of the $500 he paid the Konstants, and paid him a fee of $40 for securing $150 of the $500 he had paid on the property.

Mr. Gregg, who was called as a witness by the defendants, testified that the defendant was an organization for the purpose of financing home builders; that its home office was in St. Louis, Missouri, and that it only loaned money on improved or unimproved real estate; that C. Rothery was its president; that witness' duties were to receive applications for loans, have a committee examine the property, and if he and the committee approved the loan to refer the application to the directors of the defendant for their action; that in the year 1921 the defendant had an office in Washington, D. C., to which applications for loans could be referred for final action; that when the plaintiff and his brother came to see him about securing a loan on the Park Theatre building they assured him that they had had a great deal of experience in moving picture theatres; that they left with him a formal written application for the loan on the property;

that he agreed to recommend the loan if they could make the moving picture theatre a going concern, and show their ability to realize enough out of it to pay operating expenses and the amount of the loan in monthly installments; that he suggested to them to get an option on the property for ninety days so that they would have time to make it a going concern; that the plaintiff was also anxious that he should have time to see if he could make the theatre a going concern and make enough out of it to pay operating expenses and the loan before they obligated themselves to take the loan on the property; that the owners of the property refused to give the plaintiff ninety days, but did agree to give him sixty days, and that the plaintiff and his brother said that they could put up the deposit of $500, and that they felt certain that they would be able to find out in sixty days whether they could make the theatre a going concern that would yield them enough to pay operating expenses and the loan in monthly installments; that after the plaintiff made the contract of purchase of the property he took possession of it and kept in close touch with the witness; that the plaintiff, after opening the theatre was arrested because his operator did not have a license; that he reported to him that he had other trouble, and that after operating the theatre about ten days they were compelled to close it; that the plaintiff became very anxious because he felt that he had a elephant on his hands and was afraid that the Union Home Builders might insist on his taking the loan; that the witness assured him that the defendant would not do so, and that as it appeared to the witness that there was nothing else for the plaintiff to do but to get an estimate of the cost of the repairs or improvements required to be made on the building, he advised him to consult his counsel; that a few days after the plaintiff took the matter up with his counsel, and before the expiration of the sixty days mentioned in his contract with the Konstants, the plaintiff came to see him again and stated that he wanted to cancel the application for the loan, and

then and there cancelled the application, and said that he
"wanted to get out of the whole thing." On cross-examina-
tion he stated that his duties were to take applications for
loans desired from the Union Home Builders, have a com-
mittee examine the property and, if he and the committee
approved the loan, to refer it to the board of directors of
the Union Home Builders for final action; that he did have
a committee examine the property on which the loan to the
plaintiff was desired and that he and the committee ap-
proved the loan, but that he never referred the application
to the board of directors of the Union Home Builders be-
cause he was waiting for the plaintiff to comply with the
conditions on which the loan was to be made by making the
theatre a going concern, and showing that its operation would
yield enough to pay operating expenses and the loan in
monthly installments; that the plaintiff, instead of comply-
ing with said conditions, abandoned the proposition and
cancelled his application for the loan.

The record contains nine exceptions, but in our view of the
case it will only be necessary to consider the ninth exception,
which was to the granting of the plaintiff's prayer and the
rejection of the defendants' first, third, fourth, fifth and
ninth prayers.

By their ninth prayer the defendants ask the court to in-
struct the jury that there was no evidence in the case legally
sufficient to entitle the plaintiff to recover, and that their
verdict should be for the defendants. To entitle the plaintiff
to recover it was incumbent upon him to prove not only the
contract, but also that the defendants had failed or refused
to comply with its terms. As we have shown, the evidence
produced by the plaintiff, when given the most liberal con-
struction in his favor, is to the effect that Mr. Gregg prom-
ised to make the loan *provided* he, the plaintiff, could make
the theatre a "going concern"; that instead of making the
theatre a going concern, after operating it about ten days,
during which time he was arrested because his operator did

not have a license, the plaintiff was compelled to close it until he made certain repairs or improvements on the building demanded by the city; that the plaintiff failed or refused to make those improvements, abandoned the purchase of the property, requested Mr. Gregg to give him back his application for the loan, and obtained from the vendors of the property a part of the amount he had paid them on the contract price. It is said in *Words and Phrases Judicially Defined,* vol. 4, p. 3103, that " 'going business or establishment' is a term applied to a corporation which 'is still prosecuting its business with the prospect and expectation of continuing to do so' "; that "a going concern is some enterprise which is being carried on as a whole, and with some particular object in view," and that "the term 'going concern,' when applied to a corporation, means that it continues to transact its ordinary business," &c. Similar definitions of the term are found in 20 Cyc., 1255, and 28 C. J. 712. The evidence produced by the plaintiff, which shows only an abortive attempt and a complete failure to make the theatre a going concern, and which is in accord with the evidence produced by the defendants so far as the plaintiff's failure to meet the condition on which the loan was to be made is concerned, entirely fails to show any breach of the contract by the defendants. The defendants' ninth prayer should, therefore, have been granted, and the judgment must be reversed without awarding a new trial.

This view of the case renders it unnecessary to refer to other interesting questions presented by the record, some of which are ably discussed in the briefs of counsel.

*Judgment reversed, with costs.*