BORDEN MINING COMPANY *v.* H. & W. A. HITCHINS COAL COMPANY.

[No. 41, April Term, 1932.]

*Decided June 23rd, 1932.*

252

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Parke, JJ.

*George Henderson,* with whom was *Arthur Lovell* on the brief, for the appellant.

*Walter C. Capper* and *Paul L. Hitchins,* for the appellee.

Bond, C. J., delivered the opinion of the Court.

The appellant, owner and lessor of a coal mine in Allegany County, appeals from a decree compelling it to renew the lease, under a covenant for renewal at the end of the term on the same terms, stipulations and conditions, provided the lessee should have complied with or performed all of the conditions, covenants, agreements and stipulations to be by it complied with or performed. The conditions and covenants had not been performed, particularly in that the payments of rent or royalties by the lessee had in all but one year of the twenty for which the original lease was made fallen short of a minimum amount covenanted to be paid. The lessee, now appellee, produced evidence to show that amounts which had been paid had been received by the lessor without complaint, and, until near the expiration of the term, without any announcement of intention, or threat, to refuse a renewal; that it was not practicable, if possible, to produce from the mine coal sufficient to bring royalties according to the covenants; that a strike had interfered during eighteen months; that depression in the business had interfered; and that a new agreement by the parties with a sublessee altered the basis of the payments, so that the covenants of the lease could no longer be insisted upon. These facts and conditions, it is contended, establish a waiver or abandonment of those covenants, with

the result that the condition of performance of them as a prerequisite to the renewal of the lease could no longer be insisted upon by the lessor.

The Borden property, covering an area of over 400 acres, adjoins another, owned by the Consolidation Coal Company, which was deeper and equipped with sufficient machinery for keeping clear of water, while the Borden mine became filled with water, and as a consequence there had been no mining from it between the years 1898 and 1910, during which period it had been leased to the Hitchins Company. To gain the advantage of drainage through the Consolidation Company property, it was agreed that another lease should be made to the Hitchins Company, and that it might, in turn, make a sublease to the Consolidation Company. The lessor expressly assented to that sublease. The Borden property was then estimated to contain about 6,000 tons of coal to the acre. The lease and sublease were made on the 1st days of October and November, 1910, respectively. The royalty agreed to be paid by the Hitchins Company to the Borden Company was ten cents for each ton mined and carried away, with the proviso, "that the lessee shall pay a minimum royalty of $6,000 whether the quantity of coal mined for the respective years shall produce that amount of rental or not for the calendar year ending September 30, 1911, and for each calendar year thereafter during the continuance of this lease." The minimum was to be relaxed in a specified situation; that is "when the workings of this seam of coal shall have receded to such narrow limits as to make it impossible to mine and ship the minimum tonnage provided, the lessee will be required to pay only the royalty on the amount actually shipped." And a second proviso for relaxation of the minimum by agreement or arbitration was "that in the event of any unavoidable delay or in the event of a general strike among the employees, not within the control of the lessee, the lessee shall be released from an equitable proportion of the minimum rental; the said equitable proportion, if it cannot be agreed upon, to be determined by arbitration in the manner hereinafter provided." The usual

remedies given landlords against delinquent tenants, including the right of re-entry, were expressly secured to the lessor. The privilege was given the lessee of renewal for a further term "upon the same terms, stipulations and conditions hereinafter contained, provided the lessee or its assigns shall have complied with or performed all of the conditions, covenants, agreements and stipulations to be by it complied with or performed."

It was only in the year 1916 that the minimum requirement was met; the sum of $7,847.12 having been paid in that year. In the years 1928 and 1929 no payments were made. And the total of royalties paid during the whole twenty years of the lease was less than half of the total minimum of $120,000. The sublease to the Consolidation Company required payments from it to the Hitchins Company of eighteen cents a ton of coal mined, thus leaving the Hitchins Company an intermediate profit of eight cents a ton; and the Consolidation Company, during the twenty years, paid only $99,330.21 to the Hitchins Company, the amount exceeding $6,000 in nine years. From this total amount paid, the Hitchins Company thus received for its profit $44,146.35. Payments were made at the unit rates for coal actually mined, but not enough coal was mined to bring the payments at those rates up to the minimum fixed.

Of the several explanations given by the plaintiff's witnesses, that which accounted for the greater part of the shortage below the minimum was unprofitableness of mining more because of the cost of work required to get out the coal, and the overproduction and depressed state of the coal market of the country since 1921. The testimony was that during the term of the lease, the Consolidation Company had mined over 147 acres, and had left about 60 acres of recoverable coal about the old Borden shaft. What coal there was in the remaining area was not known; it was unexplored, and might prove productive later. But there was crushed coal there, much rock, and ventilation would be difficult and expensive, with the result that the cost would be prohibitive. At a meeting of representatives of the three companies in

New York at the expiration of the lease, a representative of the Consolidation Company declared that his company could mine a great deal of coal from the property, but that it was impossible to pay as much as eighteen cents a ton royalty; he had come intending to ask for a reduction to twelve cents a ton. In 1922 an arrangement was made for bringing coal from the Consolidation Company's own mine out through the Borden shaft, and during the remaining nine years of the term of the lease the Consolidation Company brought out from its own mine 1,500,000 tons, while from the Borden mine, on which it had a sublease, it brought out 35,819 tons, although it was estimated that there were 228,456 tons of recoverable coal in thirty-seven acres or more about the Borden shaft.

A strike of employees during eighteen months in the years 1922 and 1923 had interfered with mining to some extent. Exactly how far, is not stated, but the amount mined in those years was much smaller than the amounts in years preceding, although much larger than the amounts in all but one of the succeeding years. A fire in the year 1927 caused a shut-down of twenty-nine days. The agreement made in February of 1922, by the lessor, lessee and sublessee, is referred to as a cause of stoppage of shipments. It was made, as stated, in order to give the Consolidation Company the right to use the Borden shaft for its own coal, and, according to the evidence, resulted in a reservation from the mining work of about $3\frac{1}{2}$ acres of coal, estimated to contain 40,000 tons. That would, of course, be less than the minimum to be mined and paid for in one year. There was evidence, too, of a verbal agreement or understanding that sufficient coal should be left in pillars for support, but the amount of this is not definitely fixed; it is left in doubt whether the Borden Company had anything to do with that arrangement, which was the solving of an engineering problem, and it is conceded that the amount was to have been paid for.

Were the shortages of coal mined and royalties paid such as were provided and allowed for in the lease? The lease provides a relaxation of the minimum requirement only in

specified situations: (1) When the workings of the seam should have receded to such narrow limits as to make it impossible to mine and ship the minimum tonnage, whereupon royalties should be paid on only the amount mined and shipped; and (2) when there should be unavoidable delay; or (3) a general strike among the employees not within the control of the lessee, whereupon there should be a release of an equitable proportion of the minimum by agreement or by arbitration. It is in no part of the record stated or suggested that the seam had receded to such narrow limits as not to afford the minimum tonnage, or that there was any unavoidable delay except that of twenty-nine days from the fire in 1927, and that of the eighteen months from the strike in 1922 and 1923. The strike is not described so as to permit a decision whether it was of a specified kind or degree, if it were necessary to make that decision. There was no suggestion during the term of an agreement or arbitration on the release or relaxation of the minimum requirements. And the agreement of 1922 caused at most only a small withdrawal of coal from the minimum. It seems clear, therefore, that after making any allowance and deduction claimed as the result of these several causes, there would still remain a large shortage from the contract requirements in coal and royalties. It is not, indeed, insisted that there was not. The insistence of the plaintiff is that compliance with the requirements and with the condition precedent to a renewal, of which that compliance would form a part, was waived by the lessor.

About a month before the expiration of the term, the Hitchins Company wrote from Cumberland to a resident agent of the Borden Company, Davisson Armstrong, notifying him of its desire to have the lease renewed, and Armstrong replied by letter from Frostburg on the next day, "We accept all the provisions as stated in the lease dated the first day of October, 1910, and consider the said lease renewed." Armstrong's authority to commit his principal to a renewal is denied, and the court found that he did not have the authority. Armstrong testified that he had in mind another lease, for renewal of which no action was then required of

the Borden Company. Correspondence between the parties followed, and a meeting was held in New York, at which, after the amounts of payments made had been considered, the lessor refused to renew. In addition to the contention that there had been a waiver of the condition precedent of compliance with all the covenants of the lease, a contention of mutual mistake in fixing the minimum requirements, and need of reformation, was advanced by the Hitchins Company, but that contention is not made in the suit filed.

If the completion of a contract for the renewal is to be sought in any actions or statements of the local agent, then we should have to consider at greater length the arguments with reference to the authority of the agent to make a binding contract for such a lease, and compliance with the statute of frauds. There is no showing of express authority in the agent, the original lease was executed by the principal itself, and the agreement here might apparently be for a new lease, in effect departing from the basis specified, because the evidence tends to prove that the minimum requirements to be attempted under the old lease and included in the new would not be met. But the completion of a contract for the renewal is not to be sought in any action of the agent; the landlord or principal had covered all that ground for itself. The privilege or option of renewal included in the lease was a continuing offer by the lessor, upon specified conditions, to enter into a fresh lease at the expiration of the first term. The offer was made under seal and upon the consideration of the first lease, and therefore, though to some degree unilateral, the lessor was bound to continue it until released by some means. The acceptance of it by the lessee, at the proper time, and in compliance with any conditions imposed, completes the contract. The lessor makes its offer in a formal manner, over its own signature and seal, and, if there is an effective acceptance by the lessee, there is nothing more to be done. *Spear v. Orendorf,* 26 Md. 37, 43; *Liggett Co. v. Rose,* 152 Md. 146, 136 A. 651; *Waters v. Wambach,* 140 Md. 253, 117 A. 751; *Sweeney v. Trust Co.,* 144 Md. 612,

125 A. 522; *Andrews v. Meyerdirck,* 87 Md. 511, 40 A. 173; 2 *Tiffany, Landlord & Tenant,* p. 1537; *Finch v. Underwood,* 2 Ch. D. 310; *Bastin v. Bidwell,* 18 Ch. D. 238; *Job v. Bannister,* 2 Kay and J. 324; note, 29 *L. R. A.* (N. S.). 177.

This being the legal situation, there was no effect possible for the statement of the local agent interposed after the lessee's announcement of its intention to accept, unless it could be said that the statement was sufficient to override or alter in any way the terms of the lessor's formal offer; and there would seem to be no ground for an inference that the agent had authority sufficient for that. *Oxweld Acetylene Co. v. Hughes,* 126 Md. 437, 95 A. 45. For these reasons this court concurs with the opinion of the trial court on the position in the case of Armstrong's letter.

No waiver of the condition to renewal is to be found, we think, in the absence of complaint by the Borden Company of the shortages in royalties as they occurred, or the absence of any declaration of consequences to be expected to the privilege of renewal of the lease as offered. Silence or indulgence in this respect could not reasonably be construed to signify that the lessor intended to renew without having had compliance with the covenants during the first term. It is quite conceivable that the lessor may have resigned itself to enduring the delinquencies of that term and yet have resolved not to go into another lease, or not to decide the question of renewal until it should arise. It is true that upon a lessor's accepting a later rent he waives his right of re-entry by reason of delinquency in an earlier rent. As it was put in a leading English case on the subject, this is "because it is a contradiction in terms to treat a man as a tenant and then treat him as a trespasser." *Finch v. Underwood,* 2 Ch. Div. 310, 316. But the lessor does not by that action take any position, or make any waiver, on the future problem of renewal. And, if he had, during the term, intended that he would later renew the lease notwithstanding the present delinquencies, the intention would not have been made irrevocable unless by some action of the lessee in reliance upon it; and there was none in this case.

In the discussion of this question of waiver, confusion may result from the use of the word "forfeiture" in relation to consequences of a failure to comply with the covenants. At least we are not concerned with divestiture of an estate or right acquired, upon noncompliance with a condition subsequent, nor with construction of the agreement, nor with failure in obligations, the specified consequences of which are intended only to secure performance, when full justice can be done to the other party by money compensation—all those situations in which it is most frequently said that equity relieves of forfeitures, or looks with disfavor upon them. *Pomeroy, Equity Jurisprudence,* secs. 381, 433, 450; *Knickerbocker Ins. Co. v. Dietz,* 52 Md. 16, 28; *Lombardo v. Clifford Bros. Co.,* 139 Md. 32, 36, 114 A. 849. The agreement here is clear, and no room is left for construction; there is a privilege or option given to the lessee upon its performance of the covenants of the lease There is no estate to be forfeited; the lessee has at most an option to make an agreement for one. *Sweeney v. Hagerstown Trust Co., Spear v. Orendorf,* and *Liggett Co. v. Rose, supra; Keough v. Peck,* 316 Ill. 318, 328, 147 N. E. 266; *Durfee Co. v. Great A. & P. Co.,* 100 Vt. 204, 207, 136 A. 379 And, if the word "forfeiture" is ever properly applied to the consequences of failure to meet a condition precedent to the exercise of an option, it can mean only failure to enter into the offered agreement and relation; and, to relieve such a forfeiture as that, equity would have to remake the offer and agreement of the lessor. "The case is one of condition precedent; it is not a case of forfeiture, and none of the considerations applicable to forfeiture apply to it. A renewal of a lease is a privilege to which the tenant is to be entitled to in certain circumstances and on certain terms." James, L. J., in *Finch v. Underwood, supra.* "This is not a case of forfeiture; no right to the prizes for which the credit is claimed, was ever acquired, to be forfeited." Buchanan, C. J., in *City Bank v. Smith,* 3 G. & J. 265, 281. Certainly in this situation equity treats neither side with disfavor or bias. On the contrary, here, as in all other contractual dealings, the offeror is allowed to

stand upon the terms and conditions of his offer, as he makes them originally, or by susequent modification. A waiver of the conditions must amount to a change in the offer. And the conclusion that a lessor cannot, because he has made no complaint and taken no action upon the previous violations of covenants, be held to have made any change in his undertaking to renew upon the condition of performance of covenants during the term, is supported by the decided weight of authority.

The decisions most frequently cited on this point are the English decisions already cited here. In *Finch v. Underwood,* 2 Ch. D. 310, the lease contained an agreement to renew if all covenants had been performed previously, and a covenant to repair had been neglected. An observation of James, L. J., in the case, has been quoted. Mellish, L. J., page 315, observed that "The tenant must take the covenant to renew as he finds it; if it contains conditions precedent he must comply with them before he can claim the benefit of it, and if he has not done so, a court of equity cannot relieve him"; and, referring to waiver by the lessor of forfeiture of the term, and of his right of re-entry, by accepting rent with knowledge that the repairs were not made, said, page 316, "This forfeiture no doubt has been waived, but I do not see that this waiver can alter the terms of the covenant for renewal. Very often a landlord has no intention of waiving a breach of covenant, but having received rent after notice of it, is precluded from taking advantage of the forfeiture, because it is a contradiction in terms to treat a man as a tenant and then treat him as a trespasser." Again, in *Bastin v. Bidwell,* 18 Ch. Div. 238, there was a covenant for renewal "upon paying the rent and performing and observing the covenants," and repairs had been neglected. After a study of the nature of the covenant, and of the condition imposed, Kay, J., page 249, said the remarks of Mellish, L. J., just quoted, satisfied his mind completely on the argument for a waiver, and added: "Supposing there was a waiver of the right of re-entry, it does not seem to me at all to follow that the precedent condition would be waived or affected in

the least degree. The condition precedent is this: If you have performed your covenants altogether, then, that being a precedent condition, you shall be entitled to have the renewed lease; if you have not performed your covenants it does not matter that the lessor may have waived his right of forfeiting the lease; the condition precedent has not been performed, and if the precedent condition has not been performed, the right which depends upon it does not arise at all. * * * It is obvious the meaning was this: the landlord must have intended by a covenant worded like this to say: 'I shall have the term in which to see whether you are such a tenant as I shall think it right and expedient to grant a new lease to, and the test I propose in words is this, whether when you come for your new lease * * * you have paid your rent and performed your covenants." In *Job v. Bannister,* 2 Kay & J. 374, on similar facts, the vice chancellor said: "Even if he (the lessor) had that knowledge, and did not exercise his right to re-enter, there is nothing in that circumstance to make him liable to renew the lease, unless the lessee can show that he has fulfilled the condition on which alone the covenant to renew arises." In *Greville v. Parker* (1910), A. C. 335, the case was that a statute in New Zealand denied the lessor any right to enforce forfeiture because of breach of covenant or condition in the lease, except in a situation not in point here, and it was held that this did not enable the lessee to enforce a covenant for renewal conditioned upon previous performance and fulfillment of all the covenants of the lease, when they had not been performed and fulfilled. And see *Hollies Stores, Ltd., v. Timmis* (1921), 2 Ch. 202.

These views seem to us sound, and we find them adopted by courts in America generally. This court has never before had exactly the same question before it. See *McIntosh v. Rector,* 120 N. Y. 7, 23 N. E. 984; *Jones v. Epstein,* 134 Ark. 505, 204 S. W. 217; *Felder v. Hall Bros. Co.,* 151 Ark. 182, 189, 235 S. W. 789. In *Swift v. Occidental Min. & Petroleum Co.,* 141 Cal. 161, 74 P. 700, 704, the court said: "The waiver of the forfeiture is one thing, the renewal of the lease is quite another. The neglect of the landlord to

strictly enforce the right of forfeiture for breach of condition does not entitle the tenant to a renewal when such renewal is dependent upon faithful performance of conditions. There is no finding * * * that plaintiffs consented to any cessation of the work of exploration and development, and their mere failure to enforce a forfeiture for the cessations which occurred in 1894-95 and 1898-99 was not a waiver of performance of the conditions upon which they had bound themselves to renew the lease."

We do not, therefore, find, in the uncomplaining acceptance of the royalties actually paid under the original lease in this case, any ground for holding that the condition precedent to the making of another lease has been removed. A condition precedent to the exercise of an option must be punctually and literally performed or the option is not exercised. *Earle v. Dawes,* 3 Md. Ch. 230 and Brantly's note; *Corse v. Patterson,* 6 H. & J. 153; *Lyons v. Orange R. R. Co.,* 32 Md. 18, 29; *Mason v. Martin,* 4 Md. 124, 137; *Walker v. Cockey,* 38 Md. 75; *Bamberger v. Johnson,* 86 Md. 38, 37 A. 900; *Southern Bldg. Assoc. v. Price,* 88 Md. 155, 163, 41 A. 53; *DeCrette v. Bonaparte,* 139 Md. 252, 262, 263, 114 A. 880; *Liggett Co. v. Rose,* 152 Md. 146, 157 136 A. 651; *Rothery v. Lowe,* 144 Md. 405, 412, 124 A. 868.

The agreement or lease of 1922 is cited either as having changed the covenants to be observed during the remainder of the term, or as having constituted, by implication, an agreement at that time binding on the Borden Company to renew the Hitchins Company's lease. The 1922 agreement was made to give additional rights to the Consolidation Company, that is to say, the right to use the old shaft on the Borden property for getting out coal from its own adjoining property, and a right to use surface areas and improvements about the shaft. All three companies executed the agreement, because, as it is recited, it might alter or change some of the terms of the existing leases of 1910. It was stipulated that, if there should be any conflict with the terms, conditions, or provisions of those existing leases, the later agreement should prevail and make a modification to the extent

of the conflict, but that, in all other respects and unless modified or in conflict with the terms, provisions, and conditions of the agreement of 1922, the existing leases should stand in full force and effect and be binding upon the parties to the same in accordance with their original tenor. The changes made in the later agreement, as incidents to the right to bring Consolidation Company coal out through the Borden shaft, were that coal under an area about the shaft, amounting to between three and four acres, might be left standing and unmined, upon payment to the two lessors jointly of eighteen cents a ton for all that could reasonably be mined at a profit, except that needed in pillars or supports. The reservation was estimated by the plaintiff's witnesses to amount, in coal, to about 40,000 tons, or two-thirds of the minimum specified for one year. For bringing the Consolidation Company coal through that way, a charge of one cent a ton was imposed, to amount to at least $50 a month, which was to be paid to the Hitchins Company and the Borden Company jointly. This agreement did not affect the delinquencies during the preceding twelve years of the lease, and delinquencies unaffected by the changes in 1922 just stated continued, because of cost of getting the coal out, overproduction of coal in the country, and a bad market. These terms of the agreement of 1922 would seem, therefore, not to provide a removal of the condition precedent to a new lease, nor a compliance with that condition.

The agreement of 1922 was made to run for a period of twenty years, or beyond the expiration of the existing leases, but that fact seems to us not to afford ground for finding a binding agreement to renew the old Borden lease to the Hitchins Company at its expiration ten years later. It may be that the Borden Company could be bound to continue the privilege to the Consolidation Company to use the shaft for its own coal and use the surface and its equipment; with that question we are not concerned. But we do not see that the Hitchins Company, whose joinder in the agreement of 1922 was necessary because of its existing lease, was given a

renewal or extension of its term for the twenty years from 1922, which would not be the term of a renewed lease.

The situation shown by the evidence appears to be that the terms which were made the basis of the lease, and were fixed as the terms of any renewed lease, have proved impracticable or unprofitable. The Hitchins Company's witnesses declare that the cost at present of mining the greater part of the coal is prohibitive, and the representative of the Consolidation Company is reported to have declared that much coal could be mined, but that it would be impossible for his company to do it at the contract price. The minimum of annual royalty was not fixed upon the basis of profitableness to the lessee or sublessee; the only adjustment or relaxation provided for was that in case of the narrowing of the seam to such an extent that it would be impossible to mine and ship the minimum, and in case of unavoidable delays and strikes. And there has been no impossibility of mining and shipment caused by recession and narrowing of the seam, and delays and interferences from the other specified causes have been comparatively small. It appears to this court, then, that the covenants in this respect cannot be said to have been complied with, or nearly complied with, and that the lessor cannot be said to hold out the privilege of renewal without the precedent compliance.

And the situation may be regarded from another viewpoint. The lessee seeks, and can seek, only a fulfillment by the lessor of its offer, which is to give a new lease upon the same terms and conditions, with the partial amendments of 1922, and the court of equity could not provide other terms and conditions for the parties. Yet the lessee contends that those terms and conditions cannot as to a large part of the coal be performed, and expresses no readiness or willingness to perform them. And could the court compel the lessor to renew that situation for twenty years? It could no more do so than it could compel performance of an agreement of sale when the vendee fails to perform precedent conditions and shows an inability to comply with payments stipulated for. It may be that performance is impossible; it may be that the lessor considers

it impossible, and has abandoned any hope that the covenants might be performed; these things may be possible, although they are not shown to be facts, but, if they are facts, they would not put the lessor in the position of remodeling his offer or bind him to make an impossible arrangement for the future. *Hollies Stores, Ltd., v. Timmis* [1921], 2 Ch. 202; *Walker v. Cockey,* 38 Md. 75, 80; *Southern Bldg. Assn. v. Price,* 88 Md. 155, 163, 41 A. 53; *Beard v. Linthicum,* 1 Md. Ch. 345, 350; *Penn v. McCullough,* 76 Md. 229, 24 A. 424.

*Decree reversed, and bill of complaint dismissed, with costs.*